■ Amy Zambrana, Appellant, v City of New York et al., Respondents. [691 NYS2d 471] —Order, Supreme Court, New York County (Phyllis Gangel-Jacob, J.), entered on or about January 30, 1998, which granted defendants' motion for summary judgment dismissing the complaint, affirmed, without costs.

Plaintiff stated in her deposition that moments before a teen-age skater collided with her, causing her fall and injury, she had complained to a skating rink guard that a "couple of teenage children * * * were skating rather fast." However, neither her complaint nor any other proof demonstrates a prevailing level of risk on defendants' public ice rink beyond that ordinarily assumed by those undertaking the sport of skating at such a facility. Collisions between skaters, such as the one sustained here, are a common occurrence and a risk which all skaters assume (*Kleiner v Commack Roller Rink*, 201 AD2d 462; *Lopez v Skate Key*, 174 AD2d 534). This was an impact the guards could not have prevented, even with the most intensive supervision (*Winter v City of New York*, 208 AD2d 827; *Baker v Eastman Kodak Co.*, 34 AD2d 886, *affd* 28 NY2d 636).

What looms unduly large in the dissent's narrative of the facts is the instruction by a 16- or 17-year old female skating guard to plaintiff not to hold onto the perimeter wall, uttered shortly before plaintiff's collision with another skater. The sug-

gestion is made that this directive is "[f]urther evidence of negligence" because nothing in the handbook of rules for this rink contains such a blanket prohibition. This observation overlooks the following printed instructions on "Crowd Control," furnished along with the rules to every guard employed at the rink: "Certain portions of the ice are potential 'problem' areas, they are the ice entrance and exits, center ice, far end of the ice and the sides where people congregate." Furthermore, plaintiff herself testified that the ice adjacent to the wall was "bumpy."

Thus, the young guard's instruction to relinquish the wall support and to encourage plaintiff to move toward safer ice instead of providing a slow-moving obstruction to other skaters contributing to congestion at the side was a fully authorized and rational action to increase plaintiff's safety, not merely a mindless assertion of arbitrary authority as depicted by the dissent. Plaintiff testified that she complained to the guard: "Well, you know, everyone seems to be holding on. Why do I have to let go[?]" This testimony, indicating that the guard had begun with plaintiff to solve a problem of skaters hanging on at the side of the rink, would scarcely constitute negligence in carrying out the guard's duties, since she obviously had to start somewhere.

It should be noted that the record contains admissible evidence of the skating guard's age, in the form of lay opinion testimony (*People v Roldan*, 211 AD2d 366, 369, *affd* 88 NY2d 826). The relevance of the guard's age is not, as the dissent would have it, for creation of a possible cause of action (never pleaded) for negligent hiring of underage personnel. Nor is it mentioned to introduce a diminished standard of care. Rather, it is cited to indicate the absence of any physical intimidation that could have accompanied the skating guard's directive.

The "handrail" referred to in the dissent was nothing more than the top of the perimeter wall surrounding the rink. There was no bannister or railing, once a skater got beyond the entryway to the rink. To equate this wall with a "safety device" is to imply that the skating guard somehow deprived plaintiff of the equivalent of a helmet, knee-pads, elbow- or wrist-guards, which was simply not the case. That misperceives the duties of the skating guard, which included encouraging all skaters to keep moving around the rink—the more accomplished skaters closer to the center of the ice, and the novices toward the outside—but moving, nonetheless. Stopping on an ice rink, whether congregating in clusters or simply tarrying by the perimeter wall, creates a hazard that the skating guard was

not only entitled, but required, to address. The fact that this unfortunate accident occurred moments after she encouraged plaintiff to leave the security of the perimeter wall certainly does not establish a proximate link to defendants' liability (*Palsgraf v Long Is. R. R. Co.*, 248 NY 339, 341; *Cunillera v Randall*, 196 AD2d 75, *lv denied* 84 NY2d 808). Concur—Sullivan, J. P., Tom and Wallach, JJ.

Rosenberger and Mazzarelli, JJ., dissent in a memorandum by Rosenberger, J., as follows: I dissent and would reverse the grant of summary judgment to defendants. The majority's analysis of the disputed events rests largely on speculation or the premature resolution of questions of fact—ignoring the well-settled principle that we must draw all factual inferences in favor of plaintiff as the party opposing summary judgment (*Pirrelli v Long Is. R. R.*, 226 AD2d 166). Under this standard, it cannot be said that the conduct of defendants' employee was reasonable and adequate as a matter of law. An issue of fact exists as to whether the attendant at the skating rink, owned and operated by defendants, negligently increased plaintiff's risk of injury by ignoring other skaters' unruly behavior and by forbidding plaintiff to use the handrail, a safety device provided for patrons (*see, Nunez v Recreation Rooms & Settlement*, 229 AD2d 359, 360).

On December 30, 1995, plaintiff was teaching her 5-year-old son to skate at Lasker Rink in Central Park. Because he was a beginning skater and several teenagers at the rink were skating very fast, she held onto her son with one hand and held onto the handrail at the top of the wall with her other hand while she skated. The skate guard, who was employed by defendants to maintain safe skating conditions at the rink, approached plaintiff and ordered her not to hold onto the handrail, stating that it was against the rules. The guard ignored plaintiff's protest that she needed to protect herself and her son from the teenagers who were skating too fast. Plaintiff complied with the order, let go of the handrail, and had only skated about 20 feet further when one of those teenagers knocked her over as he squeezed by her in the small space between her body and the wall. Plaintiff was knocked to the surface of the ice and allegedly was seriously injured.

While the operator of a sports facility is not liable for the ordinary hazards of the sport (*Heard v City of New York*, 82 NY2d 66, 71, *rearg denied* 82 NY2d 889), a rink operator may be held liable if it was aware of the hazard and unreasonably increased it (*see, O'Brien v Midtown Skating Club*, 77 AD2d 829), such as by compelling plaintiff to disregard precautions

she would otherwise take (*see*, *Benitez v New York City Bd. of Educ.*, 73 NY2d 650, 658). "It is well established that participants may be held to have consented, by their participation, to injury-causing events which are known, apparent or reasonably foreseeable, but they are not deemed to have consented to acts which are reckless or intentional" (*O'Neill v Daniels*, 135 AD2d 1076, 1077, *lv denied* 71 NY2d 802). Here, it was foreseeable that the risk of injury to plaintiff would increase where defendants, through the conduct of their employee, made unavailable a safety device that was there to benefit persons such as herself (*see*, *Larson v Nassau Elec. R. R. Co.*, 223 NY 14, 20).

Courts have also drawn a distinction between a sudden collision between skaters proceeding at a normal pace, which is an ordinary risk of the sport, and a collision caused by another skater's reckless behavior (*Shorten v City of White Plains*, 224 AD2d 515). In numerous cases involving the latter situation, the rink's motion for summary judgment based on assumption of risk or lack of proximate cause has been denied, at least where the persons supervising the rink had notice of the skater's reckless conduct but failed to act (*Nunez v Recreation Rooms & Settlement, supra*; *Williams v Skate Key*, 240 AD2d 277).

Particularly in light of our obligation to draw factual inferences in plaintiff's favor, we should not conclude, as a matter of law, that a woman with a small child assumes the risk of being forced to abandon a safety device and enter into the thick of a fast-moving crowd of speeding skaters whether she feels competent to keep up with them or not. Plaintiff did not voluntarily assume the risk of being injured by the speeding skaters. Rather, she was forced to suffer an increased risk by the skate guard who ignored her complaints about the unruly skaters and prevented her from using a provided safety device. Further evidence of negligence arises from the handbook of rules for rink guards (obtained by plaintiff from defendants in discovery and submitted in the record), which discloses no rule forbidding patrons to use the handrail. In fact, it instructs guards to prevent fast skating and to keep skaters from cutting in and out of traffic. The guard nonetheless allowed these rules to be violated by the speeding skaters even after plaintiff put her on notice of the danger.

Like the motion court, the majority mischaracterizes plaintiff's argument as primarily a claim that the skate guard merely failed to intervene in time to prevent an unexpected collision (*see*, *Stemmler v State of New York*, 32 AD2d 861 [com-

plaint against roller rink based on this theory was dismissed]). This is not the issue and thus the cases on which the majority relies are simply irrelevant. Plaintiff's essential theory of liability is that despite being warned of the hazard presented by speeding skaters, the skate guard not only failed to confront these rule-breakers but actually increased plaintiff's risk by frustrating her efforts to keep out of harm's way (*Williams v Skate Key, supra*). "[D]efendant's claim that, as a matter of law, plaintiff was injured in an occurrence that is common on skating rinks and therefore assumed the risk is without merit, there being evidence that plaintiff's injury was caused not by a sudden unanticipated collision common to this sport but rather by the reckless actions of another skater that might have been foreseen and prevented by adequate supervision" (*Williams Skate Key, supra*).

This court has found in favor of the plaintiff on more than one occasion where the defendant is alleged to have increased the risk of the sport (*Nunez v Recreation Rooms & Settlement*, 229 AD2d 359, *supra* [reversing grant of summary judgment to defendant rink which ignored ongoing reckless conduct of other skaters]; *Trainor v Oasis Roller World*, 168 AD2d 235 [affirming verdict for plaintiff where rink supervisors took no action despite being twice warned of other skaters' dangerous unruly behavior]; *compare, Winter v City of New York*, 208 AD2d 827 [summary judgment for rink where plaintiff merely alleged failure to prevent sudden collision between skaters]). "The evidence demonstrates that the defendant had actual notice of the unruly activity of these patrons, had the right to control or eject these patrons, and failed in its duty to supervise the [rink] properly. Those cases relied upon by defendant are inapplicable as there were no prior warnings to the [rink] managements" (*Trainor v Oasis Roller World, supra*).

Indeed, plaintiff's case is even stronger than in *Nunez*, *Trainor* or *Williams*, because the rink's alleged negligence here was twofold. The guard " 'unreasonably increased' " the danger to plaintiff (*Benitez v New York City Bd. of Educ., supra*, 73 NY2d, at 658), not only by failing to enforce the safety rules against the speeding teenagers, but also by impeding plaintiff's efforts to protect herself from the danger that defendant allowed to exist (*see, Williams v Skate Key, supra* [alleged negligence partly consisted of failing to give other skaters a chance to get out of the way of "shout-out" skating event]).

A triable issue of proximate cause is raised by the fact that the teenagers took advantage of the space between plaintiff and the wall (created by her compliance with the order to let

go of the handrail) to slalom around her, causing her to fall. A reasonable jury could find that the accident would have been avoided if plaintiff had been allowed to stay out of harm's way, utilizing the handrail safety device as she had done up to that point.

The majority contends that proximate cause cannot be shown because no amount of supervision by the guard could have prevented the collision. This misses the point. By this reasoning, one could argue that even if it were negligent for a defendant to disable a plaintiff passenger's seat belt, that defendant would not be liable because he could not have stopped her from hitting the windshield in an ensuing crash. Similarly, defendants' potential liability is increased, not diminished, by the fact that the guard's initial negligence (if any) created a hazard that her subsequent acts could not remedy.

Inexplicably, the majority goes to great lengths to avoid facing the existence of this triable fact issue—creating alternate explanations for the parties' conduct, advancing speculative theories not even raised by defendants, and then resolving the conflict neatly in favor of defendants at every turn. Even if these new theories are possible, the most they do is confirm that a jury question exists. To go further, based on a record nearly devoid of evidence on many of these issues, would clearly violate our legal obligation to draw factual inferences in plaintiff's favor (*Pirrelli v Long Is. R. R.*, *supra*). Unfortunately, the majority takes this next step.

For instance, the majority speculates that the skate guard was enforcing another written rule against allowing people to "congregate" at the edges of the rink. There is no evidence that plaintiff was congregating with anyone, or that a traffic congestion problem had developed due to people using the handrail. It takes a leap of the imagination to draw this inference from her comment that other people were also holding onto the handrail, without any evidence that they were near her part of the rink or that they were standing still. As noted above, this may be a possible suggestion, but can hardly be considered true as a matter of law, especially since none of the parties involved in the case even hinted that this was the reason for the skate guard's directive (*see*, *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [conclusory and speculative assertions are insufficient basis for summary judgment]).

More importantly, the majority's assumption that plaintiff herself was "[s]topping on [the] ice rink" and "tarrying by the perimeter wall," which the majority treats as established fact, is directly controverted by the record. At her deposition,

plaintiff testified that she was moving with the flow of skaters at a regular pace while holding onto the wall. For purposes of a summary judgment motion, this allegation must be taken as true (*Pirrelli v Long Is. R. R., supra*), and indeed, defendants have not contradicted it. The following exchange between defense counsel and plaintiff at her deposition is instructive:

"Q. What was it specifically that [the skate guard] told you you were doing that was wrong or improper?

"A. She said that holding on to the railings weren't allowed and that I had to let go.

"Q. Between the time you first got on the ice and the time you were approached by the skate guard, did you move continuously or did you come to a stop?

"A. No, I was moving continuously."

This testimony completely undermines the majority's conclusion that as a matter of law, the skate guard acted reasonably to prevent plaintiff from violating a rule against stopping at the side of the rink.

Additionally, the rule cited by the majority does not proscribe use of the handrail—far from it. The rule simply names *numerous* areas as problem spots where guards should be especially watchful for potential accidents, not only the sides but the entrance, exits, center, and far end of the ice. If the majority's interpretation was correct, this rule would require skate guards to shepherd skaters away from the center *and* away from the periphery. This is clearly absurd, especially in light of another rule stating that figure skaters should stay in the center and less experienced skaters should skate on the outer edge of the rink. These issues require resolution at trial.

Furthermore, if it was the rink's policy to forbid the use of handrails, why have them at all? Contrary to the majority's opinion, a railing provided by the rink itself is not "the equivalent of [plaintiff's] helmet, knee-pads, elbow- or wrist-guards". When the safety device is provided by the rink itself, rather than brought onto the rink by the skater, one can presume that the rink intended the device to be used in order to prevent a hazard foreseeable to the management. In such a case, it is less plausible that a rule against use of the device would exist, and therefore more likely that a jury question of negligence is presented.

The majority minimizes the handrails which existed by referring to them as "nothing more than the top of the perimeter wall". The plaintiff's testimony indicates that there was no separate attached bar bracketed on the inside of the wall, rather

that it was the top of the wall. Such rails are familiar to anyone who has seen photos of cruise ships, or anyone who has used a recreational roller or ice skating rink. The rink manual and the defendants' attorney who deposed plaintiff both refer to the wall itself as a handrail on several occasions. For instance, the rink manual tells guards to "request that people not sit on rails". Similarly, *after* the colloquy quoted by the majority, the defense attorney asked her questions such as "During those twenty minutes, did you remain holding on to the railing?" and "After you let go of the rail, where did you go next?" Most important, defendants' own brief describes the device in question as a railing. The parties seem to be in agreement that there was a railing, whatever its configuration. This is another issue created by the majority with only the barest scintilla of evidentiary support, certainly not enough to warrant summary judgment. This view has never been urged, advanced, or even suggested by defendants.

It is unclear what point the majority is making via its repeated references to the skate guard's tender years. To the extent that the majority implies that as a teenager, the guard should not be held to strict adult standards of reasonable care, a jury question is created as to the proper standard (*see, Gonzalez v Medina*, 69 AD2d 14, 18), as well as to whether defendants were negligent in hiring safety personnel who lacked mature judgment. It is even stranger for the majority to suggest that the case might turn on whether the skate guard was a physically intimidating person. Is this a roundabout way of arguing that plaintiff, because she might not be overpowered by the guard, let go of the railing purely by choice, not under compulsion, and thereby assumed the risk of her accident? If so, the argument fails utterly. The guard's power to compel plaintiff lay not in the former's size and strength, but in the authority she represented, including the power to expel plaintiff from the rink if the latter failed to follow the purported rules.

Overall, the majority's newly proffered and totally speculative explanations for the skate guard's conduct (which are nowhere raised in defendants' brief nor supported by the record) further demonstrate that the papers raise issues of fact as to the rink's safety policies and their enforcement on the day of plaintiff's accident. The majority improperly engages in unsupported issue determination rather than issue finding by "focusing on the persuasiveness of the plaintiff['s] proof" (*Pirrelli v Long Is. R. R.*, *supra*, at 166), rather than on whether her proof supports a *reasonable inference* that defendants were negligent (*Rose v Da Ecib USA*, 259 AD2d 258).